**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

| | |
|---|---|
| TRIPLE R FARMS, LLC, | |
| Plaintiff, | |
| vs. | |
| UNITED STATES DEPARTMENT OF LABOR, LORI CHAVEZ-DEREMER in her official capacity as Secretary of Labor, and ANDREW ROGERS, in his official capacity as Administrator of Wage and Hour Division, | Civil Action No. _____ |
| Defendants. | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      This is a constitutional challenge to the U.S. Department of Labor's (DOL) in-house agency adjudication scheme. Plaintiff Triple R Farms, LLC—a small, family-owned tobacco farm in Berry, Kentucky—faces $70,049.93 in crippling penalties and back wages for alleged violations of its work contracts with seasonal laborers sourced from DOL's H-2A visa program. Rather than seek to impose that liability in a federal district court with an Article III judge and a Seventh Amendment jury, DOL is currently forcing Triple R Farms to defend itself in DOL's in-house agency courts, where DOL has appointed itself prosecutor, judge, and jury.

2.      This is unconstitutional. Under the Supreme Court's ruling in *SEC v. Jarkesy*, 603 U.S. 109 (2024), DOL's ongoing in-house administrative proceeding violates both Article III of the U.S. Constitution and the Seventh Amendment. Indeed, in a case with materially identical facts, the Third Circuit recently recognized that this exact in-house administrative

scheme violates Article III. *See Sun Valley Orchards, LLC v. DOL*, 148 F.4th 121 (3d Cir. 2025), *petition for cert. docketed*, No. 25-966 (Feb. 17, 2026). Simply put, if DOL wants to pursue breach-of-contract claims for alleged violations of H-2A work contracts, it must "proceed before a federal district court." *Id.* at 132.

3.    Still, DOL proceeds undeterred. Triple R Farms has diligently pursued its available options to vindicate its constitutional rights in the agency, but DOL has repeatedly rebuffed those efforts. After unsuccessful settlement discussions, Triple R Farms timely filed a demand for a jury trial in an Article III court (citing *Jarkesy* and *Sun Valley*), but the Administrative Law Judge (ALJ) assigned to the case denied that request in December 2025. The ALJ then denied Triple R Farms' timely request to certify the issue to the Administrative Review Board (the DOL's in-house appellate body) late last month. Now, discovery is ongoing, pre-trial motions are due in May and August, and a hearing is set for September 16, 2026 at which the administrative court will hear evidence and make factual findings.

4.    Triple R Farms is suffering ongoing and irreparable harm, as it is being forced to defend itself in an unconstitutional proceeding overseen by an illegitimate agency "judge." That harm will compound further if the September hearing goes forward, as the hearing will be presided over by an ALJ (in violation of Article III) who will make fact findings without honoring Triple R's jury trial right (in violation of the Seventh Amendment). Triple R Farms therefore seeks an order declaring Defendants' in-house administrative proceeding unlawful and enjoining it—before it is too late.

## JURISDICTION AND VENUE

5.    This Court has federal question jurisdiction over this action pursuant to the U.S. Constitution and 28 U.S.C. § 1331 because the dispute concerns a federal question that arises under the Constitution. *See also Axon Enter., Inc. v. FTC*, 598 U.S. 175 (2023).

6.      The Court has authority to grant the requested relief under the U.S. Constitution; the All Writs Act, 28 U.S.C. § 1651(a); the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a), 2202; and this Court's inherent equitable power.

7.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(b) and (e)(1). Triple R Farms, LLC is located at 2947 Robinson Renaker Rd., Berry, KY 41003, which is within Harrison County and the United States District Court for the Eastern District of Kentucky, and a substantial part of the events giving rise to the claim occurred in this district.

## THE PARTIES

8.      Plaintiff Triple R Farms, LLC is a family-owned limited liability company organized under the laws of Kentucky. Triple R Farms, LLC operates a farm in Berry, Kentucky. David Ross does most of the work on the farm, and his wife Debbie Ross does most of the associated administrative work for the business.

9.      Defendant U.S. Department of Labor is the federal administrative agency responsible for bringing enforcement actions against employers for alleged violations of the rules and regulations of the H-2A visa program, including those incorporated into work contracts between an employer and its employees. The enforcement proceeding at issue in this case, captioned *Administrator, Wage and Hour Division v. Triple R Farms LLC*, Case No. 2-024-TAE-00006 (the "DOL Proceeding"), was initiated by DOL personnel, is being tried by DOL attorneys, is being heard and decided by a DOL judge, and is subject to potential review by a panel of DOL appellate judges.

10.     Defendant Lori Chavez-DeRemer is sued only in her official capacity as the U.S. Secretary of Labor. In that capacity, she is responsible for the oversight, administration, and enforcement of the H-2A visa program.

11.     Defendant Andrew Rogers is sued only in his official capacity as the Administrator of the Wage and Hour Division. The Division is the office within the DOL to which the Secretary of Labor has delegated authority to enforce the terms and conditions of employment for H-2A visa workers. The Division is prosecuting the agency enforcement proceeding at issue in this case.

## REGULATORY BACKGROUND

### The Statutory Framework

12.     The H-2A visa program was created by Congress in 1986, as part of the Immigration Reform and Control Act, Pub. L. No. 99-603, 100 Stat. 3359. The H-2A program allows for employment of foreign nationals as temporary agricultural workers in circumstances where an employer's needs cannot be met out of the domestic labor pool. *See* 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a); 1188(a).

13.     Because the H-2A program exists at the intersection of labor and immigration law, it is administered jointly by DOL and the Department of Homeland Security (DHS). Prospective H-2A employers must obtain two *separate* forms of authorization: a labor certification from DOL and a visa petition approval from DHS. *See id.* § 1188(a).

14.     The DOL labor certification process deals with the agricultural workers' labor, including their conditions of employment, and is designed to vindicate the domestic national policy goal of preserving "the wages and working conditions of workers in the United States," *Id.* § 1188(a)(1)(B). The DHS visa petition approval process, on the other hand, deals with the workers' immigration status and eligibility to enter the country. *See* 8 C.F.R. § 214.2(h)(5).

15.     Only the DOL labor certification process is at issue in this case.

16.     As part of the labor certification process, prospective employers must fill out a "job order," 20 C.F.R. § 655.121(a), which must set out the "benefits, wages, and working

4

conditions that the employer is offering, intends to offer, or will provide" both to H-2A workers and to domestic workers in the same role, *id.* § 655.122(a). The job order must offer the same benefits, wages, and working conditions to foreign and domestic workers. *Id.*

17.    The job order is posted domestically, for the benefit of U.S. workers, before it is circulated to potential foreign workers. *Id.* § 655.121(f).

18.    DOL regulations also set out "minimum benefit, wage, and working condition provisions" that must be incorporated into the job order. *See id.* § 655.122(c).

19.    As relevant here, these minimum requirements include provisions regarding inbound transportation for workers, 20 C.F.R. § 655.122(g), transportation to the work site, *id.* § 655.122(h)(4), housing for workers, *id.* § 655.122(d)(1), a required wage rate, *id.* § 655.122(*l*), requirements and limits on deductions from pay, *id.* § 655.122(p), recordkeeping regarding worker earnings, § 655.122(j)(1), and guaranteed employment for the hourly equivalent of three-fourths of the offered workdays, *id.* § 655.122(i) (a provision termed the "three-fourths guarantee").

20.    The terms and conditions of employment set out in the job order—including the minimum terms and conditions of employment set out by DOL regulations—must be set out in a written work contract. *See id.* § 655.122(q).

21.    DOL regulations provide: "In the absence of a separate, written work contract entered into between the employer and the worker, the work contract at a minimum will be the terms of the job order and any obligations required under [DOL regulations]." *Id.*

22.    DOL inspects farms and brings enforcement actions to correct violations of the work contract between H-2A employers and their workers. *See* 29 C.F.R. § 501.0 (authorizing "the enforcement of all *contractual obligations* . . . applicable to the employment of H-2A

workers and workers in corresponding employment" (emphasis added)).

23.     Although there is no federal cause of action for private enforcement of the work contracts between H-2A employers and their workers, courts hold that the terms of the contract may be enforced through routine breach of contract claims brought by either party. *See, e.g.*, *Lopez v. Fish*, No. 11-cv-113-JRG, 2012 WL 2126856, at *2 (E.D. Tenn. May 21, 2012) ("[T]here are federal cases too numerous to count which have held that H-2A workers may pursue state breach of contract claims against employers who fail to comply with [job orders] issued by the DOL."); *Arriaga v. Fla. Pac. Farms, LLC*, 305 F.3d 1228, 1246 (11th Cir. 2002) (a job order is an agreement upon which workers can bring breach of contract claims).

## DOL's System of Administrative Adjudication

24.     Federal law authorizes the Secretary of Labor to "take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment" under the H-2A program. 8 U.S.C. § 1188(g)(2).

25.     Purporting to rely on that language, DOL has promulgated regulations authorizing its Wage and Hour Division to impose civil penalties and back wages on participating employers through administrative proceedings brought to ensure "enforcement of provisions of the work contract." *See* 29 C.F.R. § 501.16; 20 C.F.R. § 655.101(b).

26.     If the Division decides to assess a penalty or otherwise "proceed administratively to enforce contractual obligations," including through "monetary relief," it issues a written "Determination Notice," which informs an employer that the Division has conducted an investigation and determined that the employer has committed H-2A violations. *See* 29 C.F.R. § 501.31.

27.    The Determination Notice must set forth the amount of monetary penalties or other relief the Division seeks (such as back wages). *See* 29 C.F.R. § 501.32.

28.    The Determination Notice generally states that the "full amount" is "due and payable within 30 days," and that the amount "constitute(s) a debt owed to the Federal government," which is subject to the assessment of interest. But it informs the employer that they have a "right to request a hearing" on the penalty determination, which must be made and received within 30 days.

29.    The amount of a civil monetary penalty is determined in the first instance by the agency's enforcement personnel in the Division, who "shall consider the type of violation committed and other relevant factors." 29 C.F.R. § 501.19(b). These "relevant factors" include, but "are not limited to," seven factors listed in the regulation: (1) the employer's previous history of violations; (2) the number of workers affected; (3) the gravity of the violation; (4) good faith efforts to comply; (5) the employer's explanation for the violation; (6) the employer's commitment to future compliance; and (7) the extent of the employer's financial gain or the worker's financial loss or injury. *Id.*

30.    Back wages are limited to recovery of "unpaid wages." *Id.* § 501.16. But they often result in a windfall to the agency because DOL seeks the full amount of wages without accounting for what was already paid by the employer. Moreover, they are often imposed, at least in part, for deterrent purposes. *See, e.g.*, *Sun Valley*, 148 F.4th at 129 & n.5.

31.    While technically owed to the employees, in most cases involving the H-2A program back wages are collected by the agency. Employees must then claim the funds from the government. If the funds go unclaimed for three years, the government keeps the money.

32.    In 2015, the DOL's Office of Inspector General found that DOL "made minimal

efforts to locate" employees to whom it was supposed to pay back wages. U.S. Dep't of Labor, Office of Inspector General, *Wage and Hour Division Needs to Strengthen Management Controls for Back Wage Distributions* (Mar. 2015). As a result, the government kept millions in back wages that were collected by DOL and never paid to workers.

33.    Under applicable DOL regulations, "[a]ny person desiring review of a determination . . . including judicial review, shall make a written request for an administrative hearing." 29 C.F.R. § 501.33(a).

34.    If the employer does not make a timely request for a hearing, the penalty determination becomes a final order. *See id.* § 501.33; *see also id.* § 501.22.

35.    If an employer requests a hearing before an ALJ, the Office of the Administrative Law Judge assigns the case to an in-house ALJ, who is employed by DOL. *See* 29 C.F.R. §§ 501.37–.38.

36.    The ALJ eventually prepares a decision on the issues referred by the Division (*i.e.*, the violations specified in the Determination Notice on which the Division seeks monetary penalties) after completion of the hearing. *See id.* § 501.41(a).

37.    The decision of the ALJ includes a statement of the findings and conclusions, with reasons and the basis thereof, upon each material issue presented in the record, and the ALJ may affirm, deny, reverse, or modify, in whole or in part, the determination of the Division. *See id.* § 501.41(b).

38.    The ALJ serves as the fact-finder, makes credibility determinations, purports to apply the relevant law to the facts, and determines the appropriate monetary penalty. *See generally id.* § 501.34(a); 29 C.F.R. pt. 18.

39.    The Federal Rules of Evidence, including, for example, the rules against hearsay

evidence, do not apply to the ALJ proceedings. *See* 29 C.F.R. § 501.34(b). Nor do the H-2A regulations provide for a jury trial at any point during the proceedings before the ALJ.

40.     Once the ALJ issues a decision, the decision is served on all parties and DOL's Administrative Review Board (ARB), which is DOL's in-house appellate court. *See id.* §§ 501.41(c), .42(a).

41.     Agency adjudication may then continue before the Review Board. *See* 29 C.F.R. § 501.42(a). The Review Board consists of a maximum of five administrative judges appointed by the Secretary of Labor. 77 Fed. Reg. 69378, 69379 (Nov. 16, 2012).

42.     DOL regulations provide that any "party wishing review, including judicial review, of the decision of an ALJ must, within 30 calendar days of the decision of the ALJ, petition the ARB to review the decision." 29 C.F.R. § 501.42(a).

43.     The ARB's decision to "review the decision" is discretionary. *Id.*

44.     According to the DOL order that created the ARB, "[t]he Board shall not have jurisdiction to pass on the validity of any portion of the Code of Federal Regulations which has been duly promulgated by the Department of Labor and shall observe the provisions thereof, where pertinent, in its decisions." 61 Fed. Reg. 19978, 19979 (May 3, 1996).

45.     DOL's in-house adjudication process—from initial to final resolution—often spans several years.

46.     Once there is a final decision, DOL sends a letter to the employer demanding "prompt payment" and asserts that "interest is currently accruing" on the final award. The letter states that if the employer does not make full payment by a certain date, the Administrator of the Division will take appropriate steps, including referral for debt collection or litigation.

47.     There is no statute that specifically provides for judicial review of DOL's H-2A

penalty determinations. However, at the conclusion of this agency process, an employer who wishes to substantively challenge the agency's final decision can file an action seeking review of the decision in the appropriate federal district court under the Administrative Procedure Act, 5 U.S.C. § 704. *See* 29 C.F.R. § 501.42(a).

48.     If an employer seeks APA review of the final agency decision, however, the district court effectively sits as an appellate tribunal and reviews the agency's final decision under the "deferential" arbitrary and capricious standard, under which "a court may not substitute its own policy judgment for that of the agency" and instead "simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); 5 U.S.C. §§ 704, 706(2)(A).

49.     In other words, if an employer goes through the agency process and seeks judicial review at the end of the process, the agency's fact-finding, assessment of credibility, and penalty determinations all have continued legal effect in the Article III court.

50.     In addition, if the employer goes through the agency process and seeks judicial review at the end of the process, the employer never receives a jury trial.

## FACTUAL BACKGROUND

### Triple R Farms

51.     Triple R Farms is a small tobacco farm in Berry, Kentucky. The farm also grows corn, though the alleged liability here involves the farm's tobacco operations. The farm is family-owned and operated by David and Debbie Ross, a husband and wife who are both lifelong farmers. The Rosses acquired the property in the late 1990s.

52.     David primarily does the farm work, and Debbie does the administrative work, including handling employment-related issues.

53.    Tobacco farming is a labor-intensive business. The Kentucky region where Triple R Farms is located used to be blanketed with tobacco farms, but these days tobacco farming is far less common, due in large part to its labor-intensive harvests and dwindling profit margins (linked in part to an unfavorable regulatory environment).

54.    While David plants the tobacco seeds each spring, he needs additional help to cut and dry the leaves in the fall. As a result, Triple R Farms employs temporary seasonal workers through the H-2A program to help with the harvest. It would be impossible to harvest the farm's tobacco crop without these workers. Triple R Farms has used seasonal laborers for many years, and it continues to do so to date.

55.    Seasonal workers at Triple R Farms are paid a wage rate greater than the prevailing federal and state minimum wage.

56.    Workers are provided with free lodging at the farm, consistent with requirements set out at 20 C.F.R. § 655.122(d)(l).

57.    The Rosses also treat the seasonal laborers to a pig roast at the end of the season, a highlight for the workers each year.

58.    Working at a tobacco farm like Triple R Farms is hard work, but it is also comparatively well paid. Given the wage rate and the provision of free lodging, workers can make decent money over a season. And they often ask to return the next year.

### DOL's Over-$70,000 Assessment

59.    During the 2021 season, Triple R Farms participated in the H-2A visa program, as it had in prior years.

60.    In early December 2021, investigators from DOL came to Triple R Farms for a routine audit, during which DOL inspectors visited the farm and spoke with some of the

workers. Over the subsequent months, DOL inspectors asked for records via email regarding the farm's relationship with its employees.

61.     DOL has never told the Rosses that any of the workers complained about the working conditions, pay, housing facilities, or anything else at Triple R Farms.

62.     On January 10, 2023, after hearing nothing from the agency for some time, Debbie reached out to the agency to ask about the status of the audit. A DOL inspector emailed Debbie that day to set up an in-person meeting to discuss the result of the audit.

63.     The Rosses met with the DOL investigators, during which the investigators told the Rosses that DOL intended to impose back wages related to purported H-2A "job order" violations that it found during its investigation. This was news to the Rosses, who had never been told that they violated any H-2A regulations.

64.     On February 21, 2023, the DOL mailed the Rosses a Determination Notice finalizing this assessment. The letter informed the Rosses that DOL was seeking to impose over $70,000 in liability.

65.     The charges stem from alleged violations of representations Triple R Farms made to its foreign workers regarding working conditions on the farm, as set forth in the "job order," which constitutes the work contract between Triple R Farms its seasonal workers.

*The Three-Fourths Guarantee*

66.     The majority of the assessment is based on the alleged early departure of the farm's workers in 2021.

67.     DOL regulations include a "three-fourths guarantee" for H-2A workers, under which employers must "guarantee to offer the worker employment for a total number of work hours equal to at least three-fourths of the workdays" of the period for which the worker is

hired. 20 C.F.R. § 655.122(i). A worker is not entitled to that guarantee, however, if the worker "voluntarily abandons employment before the end of the contract period" or if the worker "is terminated for cause." *Id.* § 655.122(n).

68.    Moreover, under the "impossibility" exception, "[i]f before the expiration date specified in the work contract, the services of the worker are no longer required for reasons beyond the control of the employer due to fire, weather, or other Act of God that makes the fulfillment of the contract impossible, the employer may terminate the work contract." *Id.* § 655.122(o).

69.    During the 2021 season, unusually heavy rainfall led to the loss of much of that season's tobacco crop.

70.    As a direct result of this loss, the services of the seasonal laborers were not needed (as there was not enough tobacco to be cut and dried), and fulfilment of the workers' contract would have been impossible.

71.    Although the Rosses offered to have the seasonal laborers stay and help out with other clean-up tasks, such as cleaning out barns, bundling sticks, and moving things around to wrap up for the season, which would have paid the workers through the three-quarter point of the H-2A contract, the workers declined this offer.

72.    Instead, the workers left early around mid-December and, in doing so, signed paperwork stating that they were leaving voluntarily.

73.    DOL, however, claims that Triple R Farms is liable for $28,786 in back wages and $13,497 in civil penalties for the 2021 season because (according to DOL) these workers did not leave voluntarily and were fired.

74.    Whether Triple R Farms is liable for this amount depends on why the workers

left: If the workers left voluntarily, they are not owed anything. But if the workers were fired without cause, then they could be owed money under the three-fourths guarantee.

75.    Additionally, whether Triple R Farms is liable for this amount turns on an additional question: If the workers left because of a crop failure—if the flood in fact destroyed the tobacco crop that season such that it was impossible to fulfil the work contract—they would not be owed money under the "impossibility" exception regardless of whether they left voluntarily or were terminated without cause. *See* 20 C.F.R. § 655.122(o).

76.    DOL claims that Triple R Farms cannot take advantage of the "impossibility" exception because they did not file paperwork with the agency notifying the agency of the flood. However, David and Debbie were both violently ill with COVID-19 at the time and, accordingly, should be excused from that obligation.

77.    Assessment of liability will require deciding both questions of law (for instance, about the application of the "impossibility" exception) and questions of fact (for instance, about what happened when the workers left). Deciding the relevant questions of fact will require the ALJ to weigh evidence and make credibility determinations that—in federal court—would be left to a jury.

*Transportation*

78.    DOL also seeks $15,746 in penalties related to the alleged failure to provide the workers with adequate transportation.

79.    DOL alleges that Triple R Farms required workers to use a 1987 Ford Econoline passenger van with a seating capacity of eight, even though it transported eleven workers, and that the van lacked seatbelts and had some other mechanical issues.

80.    Although the Rosses bought a larger school bus for the workers to use, the

workers did not want to use it. In addition, the Rosses did not know that the workers removed the van's seatbelts.

81.     Assessment of liability on this transportation issue will require deciding both questions of law (interpreting the requirement to provide transportation) and questions of fact (about the transportation and the circumstances of its use). Deciding the relevant questions of fact will require the ALJ to weigh evidence and make credibility determinations that—in federal court—would be left to a jury.

*The Remainder of the Alleged Violations*

82.     DOL seeks to impose additional penalties and back wages on various other grounds.

83.     DOL seeks $180 in back wages related to the alleged failure of Triple R Farms to compensate one employee for the cost of inbound transportation (i.e., a worker's transportation from his home country to Triple R).

84.     DOL seeks $240 in back wages for an unspecified failure to comply with deductions, stating "[insert description of violation]" in the Determination Notice.

85.     DOL seeks $511.77 in back wages and $2,454 in civil penalties related to the alleged failure of Triple R Farms to properly record hours worked and subsequently pay the required pay rate during certain periods when the workers were paid per piece of tobacco (as opposed to an hourly rate), but were allegedly performing other work such as cleaning and collecting tobacco from barns.

86.     DOL seeks $8,180 in civil penalties related to the alleged failure of Triple R Farms to keep adequate records in two months of 2021 (October to December).

87.     Finally, DOL seeks $2,454 in civil penalties related to the alleged failure of

Triple R to obtain worker housing approval and inspection by the State Workforce Agency.

88.     The Rosses dispute each of these violations and have not conceded to any of the alleged violations of the work contracts.

89.     Like the "three-fourths guarantee" and the "transportation" violations, these remaining violations turn on factual disputes and credibility determinations, as well as various questions of law.

90.     For example, whether Triple R failed to pay the required rate turns, in part, on what the calculated worker wage rate is. *See* 20 C.F.R. § 655.122(*l*). Whether it failed to keep records turns on whether records were, in fact, kept. So too with whether Triple R notified the agency to obtain an inspection, or whether it notified the agency of the change in accommodations (or was required to do so). *See id.* § 655.122(d)(6)(iv).

91.     Since DOL has begun enforcement proceedings against Triple R Farms, the farm has continued to participate in the H-2A program. DOL has not sought to debar Triple R Farms from the H-2A program, and DOL has not sought to impose any fines related to any later or earlier years.

92.     Triple R Farms does not have over $70,000 to pay to DOL. If Triple R Farms is forced to pay that amount it will do lasting damage and may very well destroy the business.

## The DOL Proceeding

93.     As required by DOL regulations, and as instructed in the Determination Notice, Triple R Farms contested the agency's letter and requested a formal hearing.

94.     Triple R Farms requested a hearing because, under DOL's regulations, failure to do so would bar any further review of the Determination Notice. If Triple R had not asked for a hearing, the assessment in the Notice would have become final and unreviewable.

95.     On January 19, 2024, nearly ten months after Triple R Farms requested the hearing, the Administrator of the Wage and Hour Division referred the case to the DOL's Chief ALJ by filing an Order of Reference with the Office of the Administrative Law Judges.

96.     The Office of Administrative Law Judges docketed the case nearly three months later on April 18, 2024, and the case was, in turn, assigned to DOL ALJ Willow Eden Fort on May 7, 2024.

97.     DOL's delay assigning the case to an ALJ violated its own regulations, which require that the case be referred the Office of Administrative Law Judges "promptly" and that an ALJ "promptly" set the case for a hearing. *See* 29 C.F.R. §§ 501.37, .38.

98.     ALJ Fort has been employed by DOL for over half of her legal career. ALJ Fort completed her education in 2002. She worked as a trial attorney in the DOL's Office of the Regional Solicitor representing the Secretary of Labor in enforcement actions beginning in 2011, and was appointed as a DOL ALJ in Cincinnati, Ohio in November 2021.

99.     On May 15, 2024, ALJ Fort held an initial conference with the parties. At that time, Triple R Farms moved to dismiss the proceeding on the ground that DOL's delay in initiating the case violated the agency's own regulations and also deprived Triple R Farms of due process. ALJ Fort denied this request on July 5, 2024.

100.    The Supreme Court issued its decision in *SEC v. Jarkesy* on June 27, 2024.

101.    On July 15, 2024, ALJ Fort held a second conference. During that conference, Triple R Farms notified ALJ Fort that it would file a motion seeking a jury trial.

102.    The next day, ALJ Fort issued an order scheduling a hearing for June 3, 2025, and setting prehearing deadlines. This hearing was later continued to permit settlement discussions. During this time, Triple R Farms postponed moving for a jury trial to further

settlement discussions.

103.    After those discussions proved unsuccessful, the Administrator of the Division moved on July 23, 2025, to reset the matter for a hearing.

104.    The Third Circuit issued its decision in *Sun Valley Orchards* on July 29, 2025.

105.    On August 6, 2025, Triple R Farms filed a motion styled as a demand for a jury trial, in which Triple R Farms asserted that the agency's in-house administrative adjudication is unconstitutional and that the enforcement action must be heard in an Article III court before a jury. Triple R Farms relied on the Supreme Court's decision in *Jarkesy* and the Third Circuit's decision in *Sun Valley*.

106.    On December 22, 2025, ALJ Fort denied Triple R Farms' demand for a jury trial by written order. In her order, she explained that, as an ALJ employed by the agency, she lacked authority to declare the DOL's procedures unconstitutional; explained that the *Sun Valley* decision was not binding outside the Third Circuit; and also stated that, in her view, *Sun Valley* was wrongly decided.

107.    That same day, ALJ Fort granted the Administrator's motion to reset the hearing and scheduled it for September 16, 2026. The ALJ set that September date without consultation with the parties, and September is in the middle of the tobacco harvest season—when David and Debbie can least afford to take time away from the farm.

108.    On January 30, 2026, Triple R Farms moved to certify for interlocutory review by the ARB the controlling legal question of whether it is entitled to a jury trial in an Article III court. On February 20, ALJ Fort denied that request.

109.    Meanwhile, on February 12, ALJ Fort issued a second amended prehearing order. Under that order, written and oral fact discovery must be completed by March 13, 2026;

dispositive motions must be filed by May 12; other pre-trial motions must be filed by August 18, prehearing statements must be filed by August 27, and objections to witnesses and exhibits must be filed by September 10.

110.    The hearing remains set for September 16, 2026.

### INJURY TO PLAINTIFF

111.    DOL's in-house adjudication suffers from two fatal structural and individual-rights defects that render it and its actions, including the pending DOL Proceeding against Triple R, unconstitutional.

112.    Triple R Farms is currently suffering ongoing irreparable injury.

113.    Triple R Farms is suffering ongoing irreparable injury in the form of deprivation of its Article III constitutional rights because it is being forced to defend itself in a pending illegitimate proceeding overseen by an ALJ, rather than an independent federal judge protected by life tenure and other guarantees under Article III.

114.    In this pending proceeding, Triple R Farms is suffering ongoing irreparable injury because it is continuously denied its right to have an independent Article III judge oversee and manage the case, which includes, for example, deciding threshold legal questions, managing discovery, or ruling on privileges and admissibility.

115.    Triple R Farms is suffering ongoing irreparable injury in the form of a "here-and-now" injury under *Axon*, which, once done, cannot be undone. 598 U.S. at 191. Any subsequent judicial review of Triple R's claims would come too late to remedy this ongoing violation of Triple R Farms' constitutional rights.

116.    As a result, Triple R Farms is suffering ongoing irreparable injury in the form of intangible harms that cannot be reduced to a sum of money or compensable by money damages.

117.     Triple R Farms is also suffering ongoing irreparable injury in the form of unrecoverable compliance costs. While Triple R Farms is currently being forced to expend money on counsel fees and other necessary expenses to comply with DOL requests and defend itself in a pending unconstitutional proceeding, it will be unable to recover damages for those costs given the federal government's sovereign immunity.

118.     Triple R Farms will suffer additional irreparable harm if the September 16, 2026 hearing before the agency goes forward.

119.     If the September hearing goes forward, Triple R Farms will suffer irreparable injury in the form of deprivation of its Article III constitutional rights because the hearing will be presided over by an ALJ in violation of Article III.

120.     If the September hearing goes forward, Triple R Farms will suffer a "here-and-now" injury under *Axon*, which, once done, cannot be undone. 598 U.S. at 191. Any subsequent judicial review of Triple R's claims would come too late to meaningfully remedy the violation of Triple R's constitutional rights.

121.     If the September hearing goes forward, Triple R Farms will suffer irreparable injury in the form of deprivation of its Seventh Amendment right to a jury trial because the ALJ will make fact findings, not a jury. The deprivation of the jury right must be dealt with beforehand, in order to ensure that Triple R Farms is not wrung through a proceeding that ultimately is held to have been required under a mistake.

122.     At the September hearing, Triple R Farms will suffer irreparable injury because it will be denied its right to have an Article III judge oversee and manage the trial, which includes, for example, instructing the jury, making evidentiary rulings, determining a penalty amount, and entering final judgment.

123.    As a result, if the September hearing goes forward, Triple R Farms will suffer irreparable injury in the form of intangible harms that cannot be reduced to a sum of money or compensable by money damages.

124.    If the September hearing goes forward, Triple R Farms will also suffer irreparable injury in the form of unrecoverable compliance costs. Triple R Farms will be forced to expend money on counsel fees and other necessary expenses to defend itself in an unconstitutional proceeding, but will be unable to recover damages given the federal government's sovereign immunity.

125.    In addition to the monetary cost of defending itself in this agency proceeding, the proceeding also imposes significant demands on David and Debbie's time and attention. That will be all the more so if David and Debbie are forced to attend the upcoming September hearing, as the hearing will require them to be away from their farm duties during a critical time of the harvest season to stand trial before an ALJ. That is time that David and Debbie will never get back, even if the agency proceeding is later vacated.

126.    Mounting a defense in this agency proceeding is also extremely stressful, and it will only grow more so if the proceeding continues. That is another harm imposed by the agency proceeding that will never be remedied, even if the agency proceeding is later vacated.

127.    If the agency imposes liability at the conclusion of the agency proceeding, the imposition of liability will have significant impacts on Triple R Farms' business, as those who do business with Triple R Farms will know that the farm has been found to have violated federal labor laws. That is true even if the liability is subject to appeal and does not have to be paid right away. For instance, an agency decision imposing over $70,000 in liability could seriously impact Triple R's relationship with its bank and other creditors, and it could affect

Triple R's ability to obtain credit to operate the farm.  Those effects on Triple R Farms are another harm that will never be remedied, even if the agency proceeding is later vacated.

## CLAIMS

### Count I
### DOL'S H-2A Enforcement Procedures Violate Article III
### (against all Defendants under Court's inherent equitable power)

128.    The allegations of ¶¶ 1–127 are incorporated here in full.

129.    Article III, Section 1 of the U.S. Constitution states that the "judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Article III further provides various protections for the judges of these Article III courts in order to guarantee judicial independence, including life tenure, protections from removal, and salary guarantees.

130.    Under Article III, this "judicial Power shall extend to *all* Cases, in Law and Equity, arising under . . . the Laws of the United States."

131.    Because Article III is implicated when any stage of adjudication is "withdraw[n] from judicial cognizance," *Jarkesy*, 603 U.S. at 132, it requires that the entire case proceed under the auspices of an Article III court and under the ultimate control of an Article III judge.

132.    Applying these provisions, the Supreme Court has held that cases implicating an individual's "private rights" must be tried before an Article III court. *See id.* at 127.

133.    A "private rights" case is "any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Id.* at 132.

134.    This inquiry calls for a historical analysis that asks whether a case involves issues of the sort that would have been adjudicated in the common-law courts—like a person's life, liberty, or property—or whether, instead, it involves issues that historically could have

been resolved by the executive or legislative branch without judicial involvement. *Id.* at 128.

135.    Whether or not a claim is created by statute is immaterial, *id.* at 122; instead, "what matters is the substance of the action, not where Congress has assigned it." *Id.* at 134.

136.    An action that seeks to impose civil monetary penalties implicates private rights because such a penalty would historically have been litigated in the common-law courts. *See Tull v. United States*, 481 U.S. 412, 417 (1987); *Jarkesy*, 603 U.S. at 123.

137.    An action that seeks to impose back wages implicates private rights because back wages are a form of damages that would historically have been brought through an action at common law. *See Chauffeurs Local 391 v. Terry*, 494 U.S. 558 (1990). This is particularly true when the back wages are not limited to "unpaid wages" or "make whole" relief and are instead imposed, at least in part, "to punish or deter the wrongdoer." *Jarkesy*, 603 U.S. at 123; *Sun Valley*, 148 F.4th at 129 & n.5.

138.    The Supreme Court in *Jarkesy* explained that the remedy the government seeks to impose (in that case, penalties) is "all but dispositive." *Jarkesy*, 603 U.S. at 123.

139.    In addition, a suit for breach of contract is in the "nature of an action at common law," *id.* at 128, and therefore is a "private rights" case that would have been litigated in the common-law courts. *See N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring in the judgment) (recognizing "breach of contract" as "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789").

140.    Here, the DOL seeks to assess civil penalties and back wages for alleged violations of a work contract between an employer and employee (namely, Triple R Farms' alleged breach of its contract with its H-2A workers). That type of breach-of-contract theory involves paradigmatic private rights.

141.     This type of breach-of-contract claim is not a claim that could have traditionally been resolved by the executive or legislative branch.

142.     More broadly, an action that seeks the payment of money to the government—either in the form of a civil monetary penalty or in the form of back wages—affects a person's private rights because it results in the confiscation of their property.

143.     Because the DOL Proceeding involves an attempt to force Triple R Farms to pay money to the government, the DOL Proceeding implicates private rights (without the express and voluntary consent of Triple R Farms, which it has not given, *see Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 675 (2015)), and violates Article III.

144.     Triple R is being injured by this ongoing violation of Article III, will be further injured if it is forced to go through with the unlawful September hearing and subsequent agency proceedings, and is entitled to injunctive relief to prevent this injury.

### **Count II**
### **DOL's H-2A Enforcement Procedures Violate the Seventh Amendment**
### **(against all Defendants under Court's inherent equitable power)**

145.     The allegations of ¶¶ 1–127 are incorporated here in full.

146.     The Seventh Amendment to the U.S. Constitution provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

147.     As with Article III, the Supreme Court has held that this Seventh Amendment right to trial by jury applies to actions implicating a litigant's private rights. But unlike Article III, which extends to "*all* Cases . . . in Law and Equity," the Seventh Amendment applies only if the claim is "legal in nature." *Jarkesy*, 603 U.S. at 122.

24

148.    This inquiry calls for a historical analysis into whether the action would have been "viewed" as requiring trial by jury, *id.*, and whether the remedy was traditionally obtained in a court of law, *id.* at 133. The "remedy is all but dispositive." *Id.* at 123.

149.    An action that seeks "civil penalties, [which are] a form of monetary relief" implicates the Seventh Amendment right to a trial by jury because such a penalty is the "prototypical common law remedy." *Id.* at 123.

150.    Here, DOL seeks to assess civil penalties for alleged violations of a work contract between an employer and employee; namely, Triple R Farms' breach of contract with its H-2A workers. That type of breach of contract theory involves paradigmatic private rights that would historically have been viewed as the type requiring trial by jury.

151.    An action that seeks to impose back wages implicates the Seventh Amendment because back wages are a form of damages that would historically have been brought through an action at common law. *See Chauffeurs Local 391 v. Terry*, 494 U.S. 558 (1990). This is particularly true when (as here) back wages are not incidental to any form of injunctive relief and also do not seek the payment of particular sums of money held by the employer. It is also particularly true when (as here) back wages are imposed in part to punish or deter.

152.    Further, even if back wages were not legal in nature, the case belongs in an Article III court with a jury because the Seventh Amendment applies to proceedings that involve a mix of legal and equitable claims. *Ross v. Bernhard*, 396 U.S. 531, 537–38 (1970).

153.    More broadly, an action that seeks the payment of money to the government— either in the form of a civil monetary penalty or in the form of back wages—affects a person's private rights because it results in the confiscation of their property.

154.    Because there are material factual disputes and because the DOL Proceeding

involves an attempt to force Triple R to pay money to the government in the form of civil monetary penalties and back wages, adjudication by an ALJ without a jury (and without the express and voluntary consent of Triple R Farms, which it has not given, *see Wellness Int'l*, 575 U.S. at 675) violates the Seventh Amendment.

155.    Triple R is being injured by this ongoing violation of the Seventh Amendment, will be further injured if it is forced to go through with the unlawful September hearing without a jury, will also be injured if it is forced to continue to litigate the agency in agency court after the September hearing based on facts established without a jury, and is entitled to injunctive relief to prevent this injury.

## PRAYER FOR RELIEF

In light of the foregoing, Plaintiff Triple R Farms, LLC respectfully requests that this Court enter an order and judgment for Triple R Farms and against Defendants:

A.    Preliminarily and permanently enjoining Defendants from adjudicating Triple R Farms' liability or punishment for the H-2A violations, as alleged in the Determination Notice, in the DOL Proceeding, including enjoining all the operative prehearing deadlines set forth by ALJ Fort and the September 16, 2026 hearing itself;

B.    Preliminarily and permanently enjoining Defendants from adjudicating Triple R Farms' liability or punishment for the H-2A violations, as alleged in the Determination Notice, outside of an Article III court;

C.    Preliminarily and permanently enjoining Defendants from adjudicating Triple R Farms' liability or punishment for the H-2A violations, as alleged in the Determination Notice, through a proceeding that does not preserve the right to a jury;

D.    Declaring that Defendants' adjudication of Triple R Farms' private rights in the DOL Proceeding violates Article III of the U.S. Constitution;

E.      Declaring that Defendants' adjudication of Triple R Farms' private rights in the

DOL Proceeding violates the Seventh Amendment of the U.S. Constitution;

F.      Awarding Triple R Farms' costs and expenses of this action, together with

reasonable attorneys' fees, under the Equal Access to Justice Act or otherwise; and

G.      Awarding any other legal or equitable relief to Triple R Farms that the Court

deems just and proper.

DATED this 12th day of March 2026.          Respectfully submitted,

/s/Joseph A. Bilby
Joseph A. Bilby
SEQUEIRA BILBY PLLC
106 Progress Drive
Frankfort, KY 40601
(502) 409-1778
joe@sequeirabilby.com

Robert Johnson (Ohio Bar No. 0098498)*
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
Telephone:  (612) 435-3451
Facsimile:  (612) 435-5875
Email:  rjohnson@ij.org

Carl Wu (NY Bar No. 6119515)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, Virginia 22203
Telephone:  (703) 682-9320
Facsimile:  (703) 682-9321
Email:  cwu@ij.org

*Attorneys for Plaintiff*

*\* Pro hac vice motion to be filed.*