UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

TRIPLE R FARMS, LLC,                  )
                                      )
        Plaintiff,                    )        No. 5:26-CV-00087-REW-MAS
                                      )
v.                                    )
                                      )        OPINION & ORDER
UNITED STATES DEPARTMENT OF           )
LABOR, *et al.*,                      )
                                      )
        Defendants.

*** *** *** ***

Plaintiff Triple R Farms, LLC ("Triple R") filed a motion for preliminary and permanent injunctive relief under Rule 65, seeking to enjoin the Department of Labor's ongoing administrative adjudication against the farm, including an administrative hearing that is currently scheduled for September 16, 2026. *See* DE 8. Defendants, United States Department of Labor ("DOL"); Keith E. Sonderling,[1] in his official capacity as Secretary of DOL; and Andrew B. Rogers, in his official capacity as Administrator of the Wage and Hour Division ("WHD") responded in opposition. *See* DE 19. The Court held an evidentiary hearing to take any proof supplementary to the written record. *See* DE 27. The hearing only addressed the preliminary injunction, given the parties' request to hold in abeyance all other proceedings and deadlines pending the Supreme Court's ruling in *U.S. Dep't of Lab. v. Sun Valley Orchards, LLC* ("*Sun Valley*"), No. 25-966, 2026 WL 1127242 (U.S. Apr. 27, 2026). *See* DE 24; DE 25.

Triple R subsequently notified the Court that it had moved for a continuance in the underlying administrative proceeding and suggested that the continuance, if granted, could obviate

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Acting Secretary of Labor Keith E. Sonderling is automatically substituted for former Secretary of Labor Lori Chavez-DeRemer.

the need for the Court to rule on the present motion.  *See* DE 29.  At present, however, the schedule remains set, and the matter is ripe for review.[2]  Because Plaintiff fails to clearly show a likelihood of success on the merits of its constitutional claims and thus also fails to demonstrate irreparable injury, the Court **DENIES** DE 8.

### I.  Background

#### a.  Procedural and Factual Background

Triple R Farms, LLC is a family-owned tobacco farm owned and operated by David and Debbie Ross in Berry, Kentucky.  *See* DE 8-2 at 1-2.  Triple R employs temporary seasonal workers through the H-2A visa program to assist in harvesting the farm's tobacco crop.  *See id*. at 2.  In December 2021, DOL investigators visited Triple R to conduct a routine audit.  *See id*. at 3. On January 10, 2023, a DOL inspector emailed Debbie, in response to her inquiry regarding the status of the audit, to set up a meeting.  *See id*. at 4.  During the meeting, DOL informed the Rosses that their farm had violated multiple H-2A regulations.  *See id*.  On February 21, 2023, DOL mailed the Rosses a Determination Notice finalizing the charges and imposing $27,718.43 in back wages and $42,331.50 in civil monetary penalties.  *See id*.; *see also* DE 8-4 at 1.  The charges stem from various alleged wage-related, recordkeeping, housing, and transportation violations.  *See* DE 8-4 at 8-11.

Triple R contested the Determination Notice and requested a formal hearing on the matter pursuant to § 29 C.F.R. 501.33.  *See* DE 8-5.  In 2024, the case was assigned to DOL ALJ Willow Eden Fort.  *See* DE 8-9 at 3.  Triple R moved to dismiss the proceeding, claiming that the DOL's

---

[2] The Court considered *Monticello Banking Co. v. Consumer Fin. Prot. Bureau*, No. 6:23-CV-00148-KKC, 2023 WL 5983829, at *3 (E.D. Ky. Sept. 14, 2023).  Unlike here, that case involved a prospective rule, not yet in effect, and subject to a circuit split on funding propriety and a certiorari grant.  The decision viewed the merits as in equipoise and the schedule was such that an ultimate resolving decision would likely precede the expected rule implementation.  These distinctions make the case inapplicable here, in the Court's view, as a matter of merits and of process.

delay in initiating the case violated agency regulations and that the proceeding deprived Triple R of due process.  *See* DE 8-8.  ALJ Fort denied the motion.  *See* DE 8-9 at 7.  On August 6, 2025, Triple R moved for a jury trial, *see* DE 8-12, which ALJ Fort subsequently denied on December 22, 2025, *see* DE 8-13.  On January 30, 2026, Triple R moved to certify for interlocutory review by the Administrative Review Board ("ARB") the question of whether it is entitled to a jury trial in an Article III court.  *See* DE 8-14 at 3.  On February 20, 2026, ALJ Fort denied that request. *See id.* at 5.  On February 12, 2026, ALJ Fort issued a second amended prehearing scheduling order, establishing various prehearing deadlines and setting the hearing for September 16, 2026. *See* DE 8-15 at 2.

On March 12, 2026, Triple R filed the instant suit and moved for injunctive relief, claiming that DOL's H-2A enforcement procedures violate Article III and the Seventh Amendment.  *See* DE 8; DE 21.  Triple R seeks to enjoin DOL's ongoing administrative adjudication against the farm, including the administrative hearing that is currently scheduled for September 16, 2026.  *See* DE 8.  The Court instituted a briefing schedule, *see* DE 16, and conducted a prompt and plenary hearing, *see* DE 27.

### b.  Statutory and Regulatory Framework

Congress established the modern framework for regulation of immigration into the United States, including provisions for the admission of permanent and temporary foreign workers, through its enactment of the Immigration and Nationality Act of 1952.  *See* Immigration and Nationality Act of 1952 ("INA"), Pub. L. No. 82–414, 66 Stat. 163 (codified as amended at 8 U.S.C. §§ 1101, et seq.).  The INA included the formation of the H–2 visa program to handle employment of foreign workers for agricultural and non-agricultural jobs.  8 U.S.C. § 1101(a)(15)(H)(ii).  Later, Congress amended the INA by enacting the Immigration Reform and

Control Act of 1986 ("IRCA") and splitting the H–2 visa regime into the H–2A and H–2B programs.  *See* Pub. L. No. 99–603, § 301(a), 100 Stat. 3359, 3411 (amending 8 U.S.C. § 1101(a)(15)(H)(ii)(a)-(b)).  The H-2A program governs the admission of agricultural workers, and the H-2B program governs admission of non-agricultural workers.

The INA provides temporary work authorization for foreign agricultural workers under the H-2A program.  *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(a); § 1184(c)(1).  The H-2A program permits employers to temporarily hire (textually, "import") foreign workers upon DOL certification, prompted by the employer's petition, that "(A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petitioner" and "(B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed."  8 U.S.C. § 1188(a)(1)(A)–(B).  Indeed, the certification serves the stated policies of the INA, that "a nonimmigrant alien worker not be admitted to fill a particular temporary job opportunity unless no qualified U.S. worker is available to fill the job opportunity, and unless the employment of the foreign worker will not adversely affect the wages or working conditions of similarly employed U.S. workers."  20 C.F.R. § 655.0(a).  The labor effect hinges on comparable wages and conditions in the market, and the Secretary establishes the level "below which similarly employed U.S. workers would be adversely affected[.]" *See id.* at (a)(2). Temporary worker pay and conditions must meet this standard to assure comparability and protect the domestic labor market, per the regulation.  *See also Garcia-Celestino v. Ruiz Harvesting, Inc.*, 843 F.3d 1276, 1284–86 (11th Cir. 2016) ("By requiring that the 'employer' provide these baseline benefits, the regulations ensure that foreign workers will not appear more attractive to the 'employer' than domestic workers, thus avoiding any adverse effects for domestic workers.").

4

Congress directed the Secretary of Labor to promulgate regulations that would set the parameters of the program, particularly for temporary workers coming "to perform agricultural labor or services." 8 U.S.C. § 1101(a)(15)(H)). Pursuant to these regulations, prospective employers must first offer the job to and recruit workers in the United States. 20 C.F.R. § 655.121. Further, the employer must offer domestic workers "no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers." 20 C.F.R. § 655.122(a). The employer may submit an Application for Temporary Employment Certification (an "H-2A Application") to the Department of Labor ("DOL") only if suitable domestic workers do not respond to positive recruitment. *See generally* 8 U.S.C. § 1188(a), (c)(3)(A).

Before submitting an Application for Temporary Employment Certification, an "employer must submit a completed job order." 20 C.F.R. § 655.121(a)(1). The job order lists the "[j]ob qualifications and requirements[,]" 20 C.F.R. § 655.122(b), and "[m]inimum benefits, wages, and working conditions[,]" 20 C.F.R. § 655.122(c). The packages must match the wage and condition requirements of the statute and regulations. *See* 20 C.F.R. § 655.1305(b), (e), (g).

The Secretary of Labor is "authorized to take such actions, including imposing appropriate penalties and seeking appropriate injunctive relief and specific performance of contractual obligations, as may be necessary to assure employer compliance with terms and conditions of employment" of the H-2A program. 8 U.S.C. § 1188(g) (2); 29 C.F.R. § 501.1. The Secretary may also initiate administrative proceedings as necessary, or alternatively may petition "any appropriate District Court of the United States" for injunctive relief, or "specific performance of contractual obligations." 29 C.F.R. § 501.16. The Department's Wage and Hour Division Administrator investigates possible H-2A violations. If the Administrator determines violations

occurred, it may recover back wages, debar the employer from receiving future H-2A labor certifications, and impose civil money penalties. 29 C.F.R. §§ 501.15, 501.16(a)(1), 501.19(a), 501.20(a). The Administrator may also impose civil monetary penalties for "each violation of the work contract, or the obligations imposed by 8 U.S.C. § 1188, 20 C.F.R. part 655." 29 C.F.R. § 501.19(a). "In determining the amount of penalty to be assessed for each violation, the Administrator shall consider the type of violation committed and other relevant factors." 29 C.F.R. § 501.19(b).

To institute administrative proceedings, the Administrator issues a written determination explaining the Wage and Hour Division's findings and imposes any sanctions and remedies. 29 C.F.R. §§ 501.31, 501.32. An employer can request an administrative hearing before an ALJ to test the Administrator's determination. 29 C.F.R. §§ 501.33(a), 501.34, 501.35. The Federal Rules of Civil Procedure are generally applicable to litigation before the ALJ. In proceedings before the United States Department of Labor, Office of Administrative Law Judges, "[t]he Federal Rules of Civil Procedure (FRCP) apply in any situation not provided for or controlled by these rules, or a governing statute, regulation, or executive order." 29 C.F.R. § 18.10(a). The ALJ will prepare a decision on the issues referred by the Administrator. 29 C.F.R. § 501.41(a). Any party wishing review of the ALJ decision can petition the ARB. 29 C.F.R. § 501.42(a). An avenue for deferential APA review then exists in federal court. *See* 5 U.S.C. §§ 704, 706; *see also Sussex Eng'g, Ltd. v. Montgomery*, 825 F.2d 1084, 1087 (6th Cir. 1987).

## II.    Legal Standard

Federal Rule of Civil Procedure 65 empowers federal courts to enter preliminary injunctions in appropriate cases. *See* FED. R. CIV. P. 65(a). The purpose of a preliminary injunction generally is to preserve the status quo pending a trial on the merits. *See S. Glazer's Distributors*

6

*of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 848 (6th Cir. 2017). Practically, because a preliminary injunction happens, if at all, before the parties have developed the record, the movant is "not required to prove his case in full at a preliminary injunction hearing." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). Still, courts must approach any such request with care. A preliminary injunction is an extraordinary remedy, one never awarded as of right. *Winter v. Nat. Res. Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008); *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Ct.*, 769 F.3d 447, 453 (6th Cir. 2014) (preliminary injunctions are "extraordinary and drastic" remedies). The burden is always on the movant to justify the request. *See Memphis A. Philip Randolph Inst. v. Hargett,* 978 F.3d 378, 385 (6th Cir. 2020).

Access to this extraordinary remedy turns on assessment of four equitable factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of an injunction." *Hargett*, 978 F.3d at 385. These factors are not prerequisites and are meant instead to be balanced and assessed together. *See id.*; *Overstreet v. Lexington-Fayette Urban Cnty. Gov't,* 305 F.3d 566, 573 (6th Cir. 2002). The first two factors are the most integral. "If the plaintiff has 'no likelihood of success on the merits,' there is nothing left to balance and the plaintiff's request for a preliminary injunction must fail regardless of its showing on the other factors." *See PCC Airfoils, LLC v. Daugherty*, No. 25-3794, 2026 WL 1396626, at *2 (6th Cir. May 19, 2026) (quoting *Higuchi Int'l Corp. v. Autoliv ASP, Inc.*, 103 F.4th 400, 409 (6th Cir. 2024)). Likewise, a court must reject a plaintiff's request for a preliminary injunction if it fails to show any risk of irreparable injury. *See*

*id*. (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)).[3] The Supreme Court reconfirmed the elements and the requirement that the movant "must make a clear showing" as to the rubric's components. *See Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024). Here, Triple R has not shown a clear entitlement to the extraordinary relief sought. *Winter*, 129 S. Ct. at 376.

    **III.**     **Analysis**

        **a. Likelihood of Success on the Merits**

To establish a strong likelihood of success on the merits, "[i]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberative investigation." *Stryker Emp. Co., LLC v. Abbas*, 60 F.4th 372, 385 (6th Cir. 2023). Reaching that bar "requires a showing greater than the one necessary to create a genuine issue of fact, but less than the one necessary to show a preponderance." *Clark v. A&L Homecare and Training Ctr.*, 68 F.4th 1003, 1011 (6th Cir. 2023). In doing so, the plaintiff need not "establish his right to an injunction wholly without doubt," nor "prove his case in full." *Parents Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 684 F. Supp. 3d 684, 693 (S.D. Ohio 2023) (citing *Certified Restoration*, 511 F.3d at 542). And although no single factor controls, "a finding that there is simply no likelihood of success on the merits is normally fatal." *Stryker*, 60 F.4th at 385.

---

[3] The rules of evidence do not fully apply in the injunction context. Given the preliminary and summary nature of the inquiry, a court may consider hearsay and other proof not formally admissible. *See J.P. Morgan Sec. LLC v. Logsdon*, No. 3:22-CV-14-BJB, 2022 WL 179606, at *1 (W.D. Ky. Jan. 18, 2022) (noting that "a long line of authority in this Circuit" supports "trial judges . . . resting temporary injunctive relief on evidence that would not be admissible at trial" and collecting cases); *see also In re DeLorean Motor Co.*, 755 F.2d 1223, 1230 n.4 (6th Cir. 1985). Here, the Court has considered the testimony at the hearing as well as the proof submitted by the parties in the briefing. The questions here are largely legal ones.

Against this backdrop, the sole merits issue triggering the "likelihood of success" factor is whether DOL's administrative proceedings infringe upon Triple R's alleged entitlement to an Article III forum and (relatedly, in context) a jury trial. *See* DE 8-1 at 18-27. Article III provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. CONST. Art. III. Congress may not validly confer the federal government's "judicial Power" on entities outside Article III. *See Stern v. Marshall*, 131 S. Ct. 2594, 2609 (2011). The Court must define what "success" means in this context. Whether a defendant is entitled to an Article III jury trial involves a twofold inquiry: (1) whether the action implicates Article III and, secondarily, the Seventh Amendment (requiring an assessment of the cause of action and, more importantly, the remedy sought); and, if so, (2) whether the public rights doctrine applies to reframe or supersede the analysis. *SEC v. Jarkesy*, 144 S. Ct. 2117, 2127 (2024).

As to Article III, the Constitution reserves to the judiciary "any matter which, from its nature, is the subject of a suit at the common law." *See id.* at 2134 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856)). A court normally queries whether a suit concerns "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *See id*. at 2132 (quoting *Stern*, 131 S. Ct. at 2609). If so, the matter presumptively is within Article III.

The Seventh Amendment, invoking related analysis, provides that, "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. CONST. amend. VII. To determine whether an action implicates the Seventh Amendment, courts must first compare the action at issue to "18th-century actions brought in the courts of England prior to the merger of the courts of law and equity." *Tull v. United States*, 107

9

S. Ct. 1831, 1835 (1987) (citing *Pernell v. Southall Realty*, 94 S. Ct. 1723, 1731 (1974); *Dairy Queen, Inc. v. Wood*, 82 S. Ct. 894, 899 (1962)). Next, courts must then identify whether the remedy sought is legal or equitable. *Id.* at 1835-36 (citing *Curtis v. Loether*, 94 S. Ct. 1005, 1007 (1974); *Ross v. Bernhard*, 90 S. Ct. 733, 740 (1970)). Where the claims involved are "legal in nature" and seek remedies traditionally provided by courts of law rather than courts of equity, the Seventh Amendment right to a jury trial attaches. *See Jarkesy*, 144 S. Ct. at 2120. If the action satisfies this threshold inquiry—thus appearing to fall within Article III and potentially the Seventh Amendment—the Court proceeds to consider whether the "public rights" doctrine nevertheless excepts the matter from the ambit of Article III. *See id.* at 2127. *Jarkesy* acknowledged and detailed "the distinctive areas involving governmental prerogatives" resolvable "outside of an Article III court." *See id.*

Triple R argues that the enforcement proceedings at issue implicate Article III and the Seventh Amendment, under the framework articulated in *SEC v. Jarkesy*. Specifically, Triple R contends that the Secretary's action to enforce the job order is, by its terms and nature, an action for breach of an employment contract, a recognized cause of action at common law. Further, the monetary penalties sought by DOL are punitive in nature because they are "designed to punish or deter" wrongdoing and therefore constitute the type of relief traditionally awards by courts of law. *See* DE 8-1 at 26 (quoting *Jarkesy*, 144 S. Ct. at 2129). Triple R further maintains that the back pay remedy sought by DOL serves to "impose liability in the nature of a damages award." *See id*. According to Triple R, the back pay award sought here is therefore properly characterized as legal relief akin to compensatory damages rather than equitable restitution. *See id*. at 26-27 (citing *Waldrop v. S. Co. Servs., Inc.*, 24 F.3d 152, 158-59 (11th Cir. 1994)). On these bases, Triple R posits that DOL's enforcement proceedings involve claims from common law and remedies

10

traditionally recognized as legal in nature, thereby triggering the requirements of Article III and the protection of the Seventh Amendment. *See id*. at 27.

In *Jarkesy*, the Supreme Court considered whether the SEC's use of administrative proceedings to assess civil monetary penalties for alleged securities fraud violated the respondents' right to a jury trial under the Seventh Amendment. 144 S. Ct. at 2127. The Supreme Court applied the two-part test from *Granfinanciera, S.A. v. Nordberg*, 109 S. Ct. 2782, 2796 (1989) and found that "[t]he SEC's antifraud provisions replicate common law fraud, and it is well established that common law claims must be heard by a jury." *Id.* The Court noted that the SEC's fraud provisions "target the same basic conduct as common law fraud, employ the same terms of art, and operate pursuant to similar legal principles," and thus, these actions involve a matter of private right that Congress could not withdraw "'from judicial cognizance.'" *Id.* at 2136 (citations omitted) (quoting *Stern*, 131 S. Ct. at 2609). As to the second prong, the Court explained that the SEC sought civil penalties, which constituted a "prototypical common law remedy." *Id.* at 2129. Thus, the Court concluded that the claims were essentially akin to "common law fraud" claims, importing "common law soil" with them, and thereby implicating, perforce, the Seventh Amendment. *Id.* at 2137.

The Government trains its argument not on the nature of enforcement or remedy but instead on the "public rights" exception to that analysis, as recognized by *Jarkesy*. The Supreme Court cited, as an exception to the preceding rubric, the "distinctive areas involving governmental prerogatives" removed from the Article III and Seventh Amendment spheres. *Jarkesy*, 144 S. Ct. at 2120. The Court here agrees that the enforcement action in this case implicates Congress's plenary power to regulate permission and conditions for alien entry into the United States. As such, adjudication of this public right may properly fall to a non-Article III, non-jury process.

11

The "class of cases" concerning "public rights" are matters that "historically could have been determined exclusively by [the executive and legislative] branches." *Jarkesy,* 144 S. Ct. at 2132 (quoting *Stern*, 131 S. Ct. at 2610). The Supreme Court's examples include recovery of collected government revenue, tariff imposition, relations with Indian tribes, administration of public lands, and the granting of public benefits to veterans, pensioners, and respecting patents. *See id*. at 2133-34. Critical to this case, the Supreme Court also referenced Congress's "plenary power over immigration," citing the power to "prohibit immigration by certain classes of persons and enforce those prohibitions with administrative penalties assessed without a jury." *Id*. at 2132-33.

That area of authority resolves this case. Indeed, history demonstrates that Congress has consistently treated the opportunity for an alien to enter or remain in the country as a privilege subject to executive control rather than a private right requiring adjudication by Article III courts. In 1798, Congress enacted the Alien Friends Act and the Alien Enemies Act. The Alien Friends Act, which remained in force until 1800, authorized the President to order from the United States any alien he deemed "dangerous to the peace and safety of the United States[.]" Act of June 25, 1798, ch. 58., 1 Stat. 570. Likewise, the Alien Enemies Act, which remains in effect today, at least in part, empowers the President, under specific circumstances, to "apprehen[d], restrai[n], secur[e], and remov[e]" citizens of hostile foreign nations. Act of July 6, 1798, ch. 66, 1 Stat. 577; *see* 50 U.S.C. § 21. These founding-era statutes reflect the ubiquitous understanding that enforcement actions concerning the admission, exclusion, and continued presence of noncitizens, including foreign workers, fit squarely within that class of cases concerning "public rights" that "historically could have been determined exclusively by [the executive and legislative] branches." *See Jarkesy*,

12

144 S. Ct. at 2120; *see also Crowell v. Benson*, 52 S. Ct. 285, 292 (1932) (listing immigration as an issue concerning public rights).

Triple R resists designation of the present action as one concerning "public rights." Instead, Triple R claims that DOL's allegations—which involve purported violations of minimum job order requirements—seek to enforce an employer's contractual obligation to its employees through the imposition of civil penalties and back pay, thus implicating Triple R's private rights and Article III adjudication.[4]   *See* DE 8-1 at 20-22.   This contention focuses on the means of enforcement while overlooking the source and nature of the underlying matter being regulated.

---

[4] Triple R relied centrally on *Sun Valley Orchards, LLC v. U.S. Dep't of Lab.*, 148 F.4th 121 (3rd Cir. 2025) in its main brief, but stressed it less at the hearing.  That likely is owing to the prompt certiorari grant issued by the Supreme Court.  *See U.S. Dep't of Lab. v. Sun Valley Orchards, LLC*, No. 25-966, 2026 WL 1127242 (U.S. Apr. 27, 2026).  This Court carefully reviewed *Sun Valley* in light of the twinned arguments and public rights discussion.   *Sun Valley* cabined the immigration public right to "admission and exclusion of aliens" and found the H-2A labor certification process to be distinct from that area.  148 F.4th at 130-31. Instead, in *Sun Valley*'s view, the compensation and certification rules under enforcement address issues of employment law, not immigration.  *See id.* at 131.  To this Court, *Sun Valley* improperly split the H-2A program into pieces and then viewed those pieces in isolation.  It is true that a required wage or compensation rate could be viewed, without context, as merely an employment or contractual concern.  However, that relationship (between importing employer and alien worker) can arise, in this milieu, only because Congress has implemented an integrated scheme leveraging its immigration authority to a) address a demonstrated domestic agricultural need but b) do so under controls that prevent other harm from the temporary presence of alien workers.  The certification and pay/condition requirements don't simply benefit the admitted workers.  Rather, they assure that the group Congress chose to admit temporarily is entering to meet an actual need and that, in doing so, that group will not inflict labor harm by being present and working in or subject to sub-market conditions.  This surely is Congress regulating whether, why, and for what duration, and under what circumstances a worker may enter, all things that, in this Court's view, implicate the plenary power of Congress to regulate the admission of aliens and the conditions and obligations related to same.  With all due respect to *Sun Valley*, its analysis throttles an authority the Supreme Court has otherwise called "absolute," "plenary," and as embracing "every conceivable aspect of" the "right to bring aliens into the United States," including "particular restrictions on the coming in of aliens."  Indeed, the extent of *Sun Valley*'s departure from settled Supreme Court precedent is further illustrated by the numerous district courts outside the Third Circuit that have declined to adopt its reasoning. *See Butler Amusements, Inc. v. U. S. Dep't of Lab.*, No. 24-1042, 2025 WL 2457687 (D.D.C. Aug. 26, 2025), *appeal dismissed*, (D.C. Cir. Mar. 12, 2026); *see also C.S. Lawn & Landscape, Inc. v. U.S. Dep't of Lab.*, No. 23-cv-1533, 2026 WL 820976 (D. D. C. Mar. 25., 2026), *appeal filed*, No. 26-5114 (D.C. Cir. Apr. 10, 2026); *Del Valle Fresh, Inc. v. DOL,* No. 25-cv-03721-BHH, 2026 WL 1001726 (D. S. C. Mar. 11, 2026); *Frank's Nursery, LLC v. Walsh*, No. CV H-21-3485, 2022 WL 2757373 (S.D. Tex. July 14, 2022).  *Sun Valley* does not bind, nor persuade, this Court.

13

Congress has long authorized executive officials to impose monetary penalties on persons that violate the conditions or regulations governing the admission of noncitizens into the United States, and the Supreme Court has repeatedly upheld those proceedings. In *Oceanic Steam Navigation Company v. Stranahan*, the Supreme Court upheld a statute authorizing the Secretary of Commerce and Labor to assess monetary penalties against carriers that transported aliens afflicted with certain medical conditions into the United States. 29 S. Ct. 671, 672-73 (1909). Fines resulted when the carrier failed in its statutory obligation to identify prohibited passengers through a pre-passage competent medical examination, thus carrying to the United States persons not physically qualified to enter. Rejecting the argument that the assessment of such penalties required the exercise of judicial power, the Court emphasized Congress's "absolute power . . . over the right to bring aliens into the United States." *Id.* at 677. Such power—here extending to regulation of a third party charged with screening the alien before passage to America— encompassed, in the words of *Oceanic Steam*, the greatest of possible reach: "But over no conceivable subject is the legislative power of Congress more complete.[]" *Id.* at 676. Indeed: "As the authority of Congress over the right to bring aliens into the United States embraces every conceivable aspect of that subject," then its decision to vest regulatory power administratively squares with the Constitution, such authority being the "sole measure by which its validity is to be determined by the courts." *See id.*

The Supreme Court later reinforced its holding two decades later in *Lloyd Sabaudo Societa Anonima Per Azioni v. Elting*, 53 S. Ct. 167 (1932). The case again involved fines against carriers that had failed to effect competent pre-passage alien medical screening, and the entry prohibitions missed included contagious diseases and conditions that would negatively impact an alien's ability to work. *See id*. at 169. There, the Court noted that under the Constitution, "control of the

14

admission of aliens is committed exclusively to Congress, and, in the exercise of that control, it may lawfully impose appropriate obligations, sanction their enforcement by reasonable money penalties, and invest in administrative officials the power to impose and enforce them." *Lloyd Sabaudo*, 53 S. Ct. at 170. As it had in *Oceanic Steam*, the *Lloyd Sabaudo* Court called the administrative enforcement scheme "incident to the exercise by Congress of its plenary power to control the admission of aliens[.]" *See id*. at 170. The Court summarized:

> Under the Constitution and laws of the United States, control of the admission of aliens is committed exclusively to Congress, and, in the exercise of that control, it may lawfully impose appropriate obligations, sanction their enforcement by reasonable money penalties, and invest in administrative officials the power to impose and enforce them.

*Lloyd Sabaudo*, 53 S. Ct. at 170.

Triple R argues that the principle set forth in *Oceanic Steam*, and affirmed in *Lloyd Sabaudo*, has "nothing in common with fines imposed based on working conditions at a farm." *See* DE 8-1 at 24. This is reductive and misses the true mark. The statute upheld in *Oceanic Steam* regulated the conduct of carriers responsible for ensuring that entering aliens satisfied the conditions that Congress had attached to entry. *See Oceanic Steam*, 29 S. Ct. at 674, 677. There, the Supreme Court explicitly endorsed the executive branch's authority to impose monetary liability on carriers that failed to screen competently, thus missing prohibitions on entry. *See id*. at 676.

The H-2A program operates with similar dynamics. Congress has conditioned the privilege of importing foreign workers on compliance with specified labor and employment requirements, premised on demonstrated conditions, all designed to meet a verified domestic agricultural need without injuring the domestic labor market. *See* 8 U.S.C. § 1188(g)(2); *see also* 29 C.F.R. § 501.1. No one suggests Congress is required to or that any person has a right to import a non-immigrant

15

alien to do temporary agricultural work. Instead, Congress set up a system to extend the privilege of temporary worker importation, but *only* when the need actually exists and when the remedy (i.e., operation under the required working and other conditions) will not harm domestic workers. The penalties at issue therefore do not attach foundationally to an employer's contractual obligation to its employees. Instead, they attach to the conduct of employers that have sought the required certification and have bound themselves to adhere to the responsibilities of program participation.[5] Simply put, this is part of Congress's "exercise of that control" over the admission of aliens.

*Oceanic Steam* and *Lloyd Sabaudo* target means of assuring the physical condition of aliens entering the country, protecting the United States from persons carrying certain diseases or, later, having an inability to work. The H-2A program targets the means of assuring the condition of aliens while temporarily meeting an agricultural need within the United States, granting the employer the privilege but protecting the United States from the risk of workers that would, by presence and circumstance, undercut and harm the domestic labor market. The harms addressed are not identical, but given Congress's "plenary," nay "absolute" power over alien admission, then

---

[5] It is interesting to the Court that Triple R, in reply, refers to *Wong Wing v. United States*, 163 U.S. 228 (1896) as authority that "cuts the legs out from under the government's theory in this case." The idea, one infers, is that *Wong Wing* drew a line between alien exclusion and criminal prosecution and punishment of an alien (or perhaps others). From this, Triple R derives that *Wong Wing* would bar a Congressional scheme that administratively imposes fines for the violation of an immigration-related duty. Triple R says *Wong Wing* would bar, *e.g.*, a fine likened to confiscating property. DE 23, at 21. The problem is that *Oceanic Steam* directly addressed and rejected *Wong Wing*'s impact on the fine scheme there at issue:

> The contention that because the exaction which the statute authorizes the Secretary of Commerce and Labor to impose is a penalty, therefore its enforcement is necessarily governed by the rules controlling in the prosecution of criminal offenses, is clearly without merit, and is not open to discussion.

*Oceanic Steam*, 214 U.S. at 337–38 (rejecting *Wong Wing* as impactful to scheme). The Court does not view *Wong Wing* as foreclosing a civil penalty in this case.

16

surely rules designed to assure the justification for entry and to guard against the calculated harm of temporary presence fall within Congress's power, as an immigration incident, to "impose appropriate obligations, sanction their enforcement by reasonable monetary penalties, and invest in administrative officials the power to impose and enforce them." *Lloyd Sabaudo*, 53 S. Ct. at 170. Rules designed to assure that Congress's expectations about and protections regarding alien entry are met—whether as a matter of domestic health or domestic economic risk—fall within the same capacious power long recognized as typifying the public right of regulating immigration. The "public rights" conclusion eliminates Triple R's chances of success in this case.

A final note. During the evidentiary hearing, Triple R cited as supportive authority on injunction procedure the Sixth Circuit's recent unpublished decision in *KALSHIEX LLC v. Matthew T. Schuler, et al.*, No. 26-3196, 2026 WL 1295806, at *7 (6th Cir. Apr. 24, 2026). First, Triple R did not make this argument, which hinges on *In re Delorean Motor Co.*, 755 F.2d 1223 (6th Cir. 1985), in its main brief. Second, in *KALSHIEX*, the Court, unpublished, stated its misgivings about the *In re DeLorean* "weaker showing" both in light of *Winter*'s requirement of demonstrable likely success and in the context of a challenge to a duly-enacted statute. *See KALSHIEX,* No. 26-3196, 2026 WL 1295806, at *6-7. Simply put, given *Jarkesy*'s "public rights" recognition and the clarity of the Supreme Court's essentially unqualified views on immigration power, the Court sees no basis for treating *Jarkesy* as signaling a success likelihood. Indeed, the Sixth Circuit recently called immigration "just such an example of a matter concerning public rights" and rejected any impact from *Jarkesy* on that analysis—"*Jarkesy* clearly does not implicate immigration adjudication." *Elgebaly v Garland*, 109 F.4th 426, 437-38 (6th Cir. 2024). Even the diluted approach of *In re Delorean* would not help Triple R in this scenario, and the Court eschews the invitation to employ it against a duly-enacted federal statute.

### b. Irreparable Harm

Preliminary injunctions in constitutional cases often turn on the likelihood of success on the merits of the plaintiffs' claims. *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). But this general rule does not do away with the "indispensable" prerequisite of showing a likelihood of immediate and irreparable harm. *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019). If a plaintiff is not facing imminent and irreparable injury, then there is no need for a court to grant relief at the start of a lawsuit, as opposed to at the end of the lawsuit. *See id.* at 27. A plaintiff seeking injunctive relief must show that irreparable injury is not merely "possible" but that it is "likely," absent an injunction. *See Winter*, 129 S. Ct. at 375-76. The Sixth Circuit has held that a party's injury is "irreparable" when its losses are "unrecoverable," *Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023); the injury is "not fully compensable by money damages," *Overstreet*, 305 F.3d at 578; and when the nature of the loss would make damages "difficult to calculate," such as "competitive losses and losses of customer goodwill," *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992).

Triple R argues that it will suffer irreparable harm because DOL's enforcement proceedings violate its right to adjudication in an Article III court and Seventh Amendment right to a trial by jury. *See* DE 8-1 at 27-28. Further, as to tangible harm, Triple R notes that it "does not have unlimited resources to defend itself against DOL's allegations, and every day that it spends defending itself in DOL's unconstitutional agency courts dissipates its resources." *See id.* at 28-29.

It is true that "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *ACLU of Kentucky v. McCreary Cnty.*, 354 F.3d 438, 445 (6th Cir. 2003) (citing *Elrod v. Burns*, 96 S. Ct. 2673, 2689 (1976)), *aff'd sub nom. McCreary*

18

*Cnty. v. ACLU of Ky.*, 545 U.S. 844 (2005). By that same token, "[T]he first factor of the four-factor preliminary injunction inquiry—whether the plaintiff shows a substantial likelihood of succeeding on the merits—should be addressed first insofar as a successful showing on the first factor mandates a successful showing on the second factor—whether the plaintiff will suffer irreparable harm." *See id*. The Court has already found that Triple R failed to demonstrate a likelihood of success on the merits. Accordingly, Triple R cannot rely on an alleged constitutional violation to establish irreparable harm, nor can it manufacture such harm through the costs allegedly attendant to that violation.[6] *See, e.g., Overstreet*, 305 F.3d at 578 (denying plaintiff's argument that he is entitled to presumption of irreparable harm absent showing of likelihood of success on the merits). Both arguments depend upon a likely constitutional violation, which Triple R has failed to establish.

Although the preliminary injunction inquiry requires the Court to balance multiple factors, "a finding that there is no likelihood of irreparable harm . . . or no likelihood of success on the merits . . . is usually fatal." *Ecolab, Inc. v. Shanklin*, No. 3:23-CV-215-CHB, 2023 WL 4360286, at *4 (W.D. Ky. June 20, 2023) (quoting *CLT Logistics v. River W. Brands*, 777 F. Supp. 2d 1052, 1064 (E.D. Mich. 2011)). Here, Triple R has failed to clear both hurdles and the Court need not address the remaining injunction factors. A proper consideration of these primary factors alone requires denial of the requested injunctive relief.

---

[6] The Court notes two additional observations in response to Triple R's allegations regarding litigation costs and liability exposure. First, "[m]ere litigation expense, even substantial and unrecoupable cost, does not constitute irreparable injury." *F.T.C. v. Standard Oil Co. of California,* 101 S. Ct. 488, 495 (1980) (quoting *Renegotiation Board v. Bannercraft Clothing Co.*, 94 S. Ct. 1028, 1040 (1974)). Second, any injury Triple R suffers by participating in the ALJ proceedings, as to adjudication result, is not beyond redress; the appellate process provides an adequate mechanism to remedy any merits error that may occur. *See* 29 C.F.R. § 501.42; 5 U.S.C. § 706; *see also Sussex*, 825 F.2d at 1087.

## IV.    Conclusion

At bottom, Triple R's central arguments isolate single features of the broader H-2A regulatory scheme while disregarding the framework as a whole.  Whatever resemblance the remedies may bear to traditional legal relief, the proceedings themselves arise from Congress's exercise and implementation of its immigration authority, an area in which Congress has no rival..

Triple R's injunction showing suffers critical lacunae at the first two Rule 65 factors.  Given the Court's conclusion that Plaintiff has not clearly shown a likelihood of success (and thus has not shown a likely constitutional injury), the Court sees no need to vet the remainder of the test. The Court rejects the Rule 65 showing and **DENIES** DE 8.

This the 13th day of June, 2026.

Signed By:

_Robert E. Wier_

**United States District Judge**